UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL GILL,

                            Plaintiff

                                                             DECISION AND ORDER

-vs-

                                                             07-CV-6532 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                            Defendant.

_____

APPEARANCES

For the Plaintiff:              William J. McDonald, Jr., Esq.
                                   Bond and McDonald, P.C.
                                   91 Genesee Street
                                   Geneva, New York 14456

For the Defendant:           Terrance P. Flynn, Esq.
                                   United States Attorney for the
                                   Western District of New York
                                   Christopher V. Taffe, Esq.
                                   Assistant United States Attorney
                                   100 State Street
                                   Rochester, New York 14614

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which denied plaintiff Michael Gill's ("Plaintiff") application for disability insurance benefits.  Now before the Court is Plaintiff's motion for judgment on the pleadings [#3]

and Defendant's cross-motion [#4] for the same relief.  For the reasons stated below, Defendant's application is denied, Plaintiff's application is granted, and this matter is remanded for the calculation of benefits.

## PROCEDURAL HISTORY

Plaintiff applied for disability benefits on or about November 28, 2005, claiming to be disabled due to, *inter alia*, "right shoulder injury" and "shingles," with an alleged onset date of November 15, 2004. (119).[1] The Commissioner denied the application, and on August 24, 2006, a hearing was held before Administrative Law Judge Timothy McGuan ("ALJ").  On September 8, 2006, the ALJ issued a decision denying benefits, finding that Plaintiff was able to perform less than a full range of light work. (74-83, 82). On February 5, 2007, the Appeals Council remanded the action to the ALJ, finding that "[t]here [was] no vocational evidence in the record regarding the extent to which the claimant's [nonexertional] limitations erode the occupational base for light work." (85). On remand, the ALJ obtained testimony from a Vocational Expert ("VE").  Following the second hearing, the ALJ once again concluded that Plaintiff was not disabled. (40-41). Plaintiff appealed the ALJ's determination, and on October 12, 2007, the Appeals Council denied review. (7).  On October 30, 2007, Plaintiff commenced the subject action.

## VOCATIONAL HISTORY

Plaintiff was born on September 26, 1978 and has a twelfth-grade education. His employment history includes work as a construction laborer and landscaper.

---

[1]Unless otherwise noted, citations are to the Administrative Record.

MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here. It is sufficient for purposes of this Decision and Order to note that Plaintiff's two most significant impairments are a chronic injury to his right shoulder, and chronic pain in his right side which doctors have attributed to Postherpetic neuralgia ("PHN"). With regard to Plaintiff's shoulder condition, he has undergone four surgeries for shoulder impingement syndrome, with little or no improvement with respect to pain. For example, on October 13, 2005, Dr. Helen Wong, M.D. ("Wong"), Plaintiff's treating orthopedic surgeon, stated: "Impression: Status post right shoulder arthroscopy and decompression with persistent scapulothoracic type pain." (285). On August 31, 2006, Wong stated, with regard to Plaintiff's right arm, that Plaintiff could lift less than ten pounds, that he was unable to reach, push, pull, or work repetitively with small objects, and that he would need to rest his right hand frequently. (405-406).

As already mentioned, in addition to his chronic shoulder injury, Plaintiff suffers from pain in his right upper quadrant. In that regard, Plaintiff previously suffered from a shingles (herpes zoster) rash that "covered the whole right side of [his] body from the middle of [his] stomach all of the way to the middle of [his] back" (525; 184), and doctors have concluded that Plaintiff's right-side pain is the result of PHN. According to the Mayo Clinic's internet website, PHN

> is a painful condition affecting your nerve fibers and skin. Postherpetic neuralgia is a complication of shingles, a second outbreak of the varicella-zoster virus, which initially causes chickenpox.
>
> During an initial infection of chickenpox, some of the virus remains in your body, lying dormant inside nerve cells. Years later, the virus may reactivate, causing shingles.

3

> Once reactivated, the virus travels along nerve fibers, causing pain. When the virus reaches your skin, it produces a rash and blisters. A case of shingles (herpes zoster) usually heals within a month. But some people continue to feel pain long after the rash and blisters heal — a pain called postherpetic neuralgia. A variety of treatments for postherpetic neuralgia exist, although you may not experience complete relief from pain.
>
> The symptoms of postherpetic neuralgia are generally limited to the area of your skin where the shingles outbreak first occurred. They may include:
>
> * Sharp and jabbing, burning, or deep and aching pain
> * Extreme sensitivity to touch and temperature change
> * Itching and numbness
> * Headaches
>
> In rare cases, you might also experience muscle weakness or paralysis — if the nerves involved also control muscle movement.
>
> ***
>
> In some cases, treatment of postherpetic neuralgia brings complete pain relief. But most people still experience some pain, and a few don't get any relief. Although some people must live with postherpetic neuralgia the rest of their lives, most people can expect the condition to gradually disappear during the first three months.

http://www.mayoclinic.com/health/postherpetic-neuralgia/DS00277; *see also*, THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1295 (Mark H. Beers, M.D. et al. eds., 1999) ("The pain of postherpetic neuralgia may be sharp and intermittent or constant and may be debilitating."). Several years after the shingles outbreak, Plaintiff began experiencing severe pain in his right side. Plaintiff's treating doctors have, almost-uniformly,[2] concluded that such pain is the result of PHN.[3] For example, on May 5,

---

[2] Plaintiff's primary care physician, Dr. Timothy J. Ryan, M.D., initially admitted to being perplexed by the cause of Plaintiff's right-side pain, though he doubted that it was due to PHN. *See*, (160) ("It is very difficult to sort out whether this is rib wall pain or chest wall pain or whether it is right upper quadrant abdominal pain. ... He has had injections to his back for the possibility of postherpetic neuralgia, although it is not a typical neuralgia pain. I think this is more costochondral pain."); (162) ("I do not have an answer for this."); (163) ("Patient seen today for check on right rib pain. We do not really know what this is. . . . I think it is highly unlikely this is related to the shingles in the [sic] fact that the pain went away and now it has come back years later."). However, as discussed below, the specialists to whom Ryan referred Plaintiff agreed that his pain was likely due to PHN, and Ryan ultimately accepted that diagnosis, even though he found it "questionable." (425-426). The Court holds that neither Ryan's uncertainty in this

2005, Dr. Rajbala Thakur, M.D. ("Thakur"), of the Pain Center at Strong Memorial Hospital, examined Plaintiff and concluded that Plaintiff's "right thorax pain" was due to "post-herpetic neuralgia." (324-25). Thakur also reported that Plaintiff's pain was aggravated by "sitting still" and by "any physical activity using the right side of his body." (324). On March 7, 2005, Dr. Scott Yoder, M.D. ("Yoder") examined Plaintiff and reported:

> Of note, the patient does have significant tenderness in the muscle and skin over the lateral aspect of the right side. This extends from the middle of his ribcage down into his abdomen and includes the muscle groups as well as the skin. There are some mild scarring changes from what the patient states is a zoster [shingles] episode. These are in the same area as the tenderness.

(332). Yoder concluded that Plaintiff's pain was "most likely musculoskeletal," and that "[s]ome of this may be postherpetic neuralgia." (333). Another treating pain specialist, Dr. Donovan Holder, M.D., similarly concluded that Plaintiff's pain was due to his right shoulder injury and "postherpetic neuralgia." (340, 351). Before being diagnosed with PHN, Plaintiff, as a result of his right-side pain, was referred to numerous specialists, including urologists, neurologists and gastroenterologists, had various diagnostic

---

regard, nor the opinion of examining consultant Dr. Naughten, which did not address PHN, provides substantial evidence which would allow the ALJ to discount the opinions of specialists Wong, Kasulke, Thakur, Shah and Holder, all of whom agree with the PHN diagnosis. In other words, on the present record the opinions of Wong, Kasulke, Thakur, Shah and Holder concerning Plaintiff's PHN are entitled to controlling weight.

[3]*See*, 281 (Dr. Wong: Plaintiff "is having severe right-sided pain, related to a neuritic condition. ... H has significant increasing pain on his right side of his body."); 280 (Dr. Wong: "I suspect the majority of his pain is related to his . .. Shingle pathology."); 270 (Dr. Kasulke: "My impression is irritation secondary to postherpetic infection changes, and he is going to be seeing a pain specialist in the near future. I think this may be his best bet."); 474 (Dr. Thakur: "Mr. Gill had his herpes zoster outbreak in July of 2000, and continues to suffer with post-herpetic neuralgia."); 331 (Dr. Shah: "His pain is likely postherpetic pain and he should keep his appointment with the pain clinic.").

testing, and underwent surgical procedures including a liver biopsy and cholecystectomy. Plaintiff has also participated in an experimental study for the treatment of PHN at Strong Memorial Hospital, and has tried alternative treatments such as acupuncture. (515-516). None of Plaintiff's doctors have stated that they believe him to be malingering.

On December 16, 2005, Holder completed a report stating that Plaintiff could not lift more than ten pounds, could not perform overhead work with his right shoulder, and should avoid temperature extremes, but also stating that Plaintiff could "perform sedentary type work." (348). On July 24, 2006, Holder completed another report, in which he stated that Plaintiff could lift only ten pounds, was unable to reach, push or pull, and was unable to work repetitively with small tools or small objects. (399-400). Holder also stated that, during an eight-hour workday, Plaintiff was limited to sitting for a total of four hours, sitting for four hours continuously, standing for a total of two hours, standing for two hours continuously, walking for two hours total, and walking for two hours continuously. (399).

Although Plaintiff takes a variety of prescribed pain medications, such as Vicodin, he still experiences significant pain in his right shoulder and his right upper quadrant. *See*, 340 (Dr. Holder: "He is currently being treated in pain treatment medicine for right shoulder pains and postherpetic neuralgia. He continues to require significant medication management and will have this lifelong need."); 349 (Dr. Holder: "In the last year, his right-sided pain is now constant and is usually a 7 on a scale of 1 to 10."). In addition, Plaintiff experiences side-effects from his pain medications, including feeling "dizzy" and "tired." (520, 522).

6

On January 25, 2006, Dr. James Naughten, D.O. ("Naughten"), a non-treating consultant physician, conducted an independent "Internal Medicine Examination." (359-362). According to Naughten, Plaintiff's "chief complaint" was "right shoulder pain" (359). Naughten's report makes no mention of shingles or PHN. According to Naughten, Plaintiff's medical examination was essentially normal, except that Plaintiff had somewhat decreased (4/5) strength in his right arm. (361). Naughten's diagnosis was "[r]ight shoulder pain status post surgical procedures due to torn rotator cuff, as per history." (362). Naughten concluded that Plaintiff had no limitations on his ability to sit, stand or walk, had mild-to-moderate limitations on his ability push, pull, reach and handle with his right arm, and had moderate limitation on his ability to lift with his right arm. (*Id.*).

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the Commissioner may carry her burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[4] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. §

---

[4]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

416.969a(d).[5]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed

---

[5]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

> treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a).  The regulation further states, in relevant part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

## THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff was not engaged in substantial gainful employment. At the second step of the analysis, the ALJ found that plaintiff had the following severe impairments:

"right rotator cuff tear and impingement syndrome." (76).  At the third step of the sequential analysis, the ALJ found that plaintiff's "severe impairments" did not meet or equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (13-14).

At the fourth step of the analysis, the ALJ made the following residual functional capacity ("RFC") determination:

> [C]laimant has the residual functional capacity to lift and carry up to 20 pounds occasionally and to sit, stand or walk throughout the workday.  He cannot crawl or climb ropes or ladders.  He should avoid reaching overhead or pushing more than 10 pounds with his dominant right upper extremity but this is only as a precaution.  He should avoid concentrated exposure to extreme cold and dampness.

(79).  In making this determination, the ALJ expressly rejected the opinions of treating physicians Ryan, Wong and Holder. (77-79).  Instead, the ALJ relied on the opinion of Naughten, who examined Plaintiff consultatively on one occasion, and who did not provide any opinion concerning Plaintiff's PHN diagnosis. (78, 81).  In fact, the ALJ rejected the idea that Plaintiff suffers from PHN:

> Strangely, a diagnosis of neuropathy secondary to herpes zoster infection was listed along with the claimant's history of right shoulder problems. However, these conclusions are not consistent with the record discussed above, particularly since the claimant has absolutely no impairment of the left upper extremity whatsoever and there is no evidence the claimant has neuropathy and, in particular, no evidence of neuropathy resulting from shingles.

(78).[6]   Additionally, the ALJ found Plaintiff's complaints of pain to be incredible (77)

---

[6]Regarding this statement, it is unclear whether the ALJ failed to review Plaintiff's medical records, which are replete with references to PHN by numerous doctors, or whether the ALJ simply substituted his own medical opinion for those of Plaintiff's treating doctors.  In either event, the ALJ's statement was erroneous.

11

("The claimant described his pain as 7/10 in intensity but this seems exaggerated."), and he also rejected Plaintiff's claim that he suffered side-effects from his medications. (38-39, 81).

In any event, based upon his RFC determination, the ALJ concluded that plaintiff could not perform his past relevant work, which jobs were classified as either heavy or medium exertional level. However, at the fifth step of the five-step sequential analysis, the ALJ concluded that plaintiff could perform other work in the national economy. The ALJ purported to base that finding on the testimony of the VE, whom the ALJ questioned concerning a hypothetical individual with the following abilities: No limitations on sitting or standing; able to lift twenty pounds occasionally and ten pounds frequently; unable to push more than ten pounds with dominant hand; and cannot reach overhead. The VE identified three jobs that such a person could perform: mailroom clerk, lobby attendant and telephone marketer. The mailroom clerk job required standing for four-to-six hours per day, frequent handling, reaching and fingering, and occasional lifting of up to twenty pounds. The lobby attendant's job required standing for six-to-eight hours, occasional reaching, handling and fingering, and occasional lifting of up to twenty pounds. The telephone marketer's job required sitting for six or more hours per day, occasional reaching and handling, and frequent fingering. Additionally, for the telephone marketer's job, a person unable to use their dominant hand would need an accommodation, in the form of a period of adjustment to become comfortable using a computer mouse with his non-dominant hand. (534, 543-544). The ALJ concluded that plaintiff could perform all three jobs, and therefore was not disabled. (41).

ANALYSIS

Plaintiff contends that the ALJ erred in several respects.  First, Plaintiff maintains that the ALJ incorrectly determined his residual functional capacity, as a result of failing to apply the treating physician rule.  Second, Plaintiff contends that, as a result of incorrectly determining residual functional capacity, the ALJ also erred by posing incorrect hypothetical questions to the VE.  Third, Plaintiff alleges that the ALJ improperly assessed his credibility, by ignoring Plaintiff's pain and focusing instead on Plaintiff's arm strength, and by failing to consider Plaintiff's good work history and his consistent efforts to obtain treatment.  Finally, Plaintiff contends that the case should be remanded solely for the calculation of benefits, inasmuch as the only job identified by the VE that Plaintiff could arguably perform, namely, telemarketer, would require an "accommodation" from an employer.

The Court agrees that the ALJ committed errors that require reversal.  For example, the Court agrees that the ALJ failed to properly apply the treating physician rule, when he rejected the opinions of Ryan, Holder and Wong and gave "significant weight" (81) to Naughten's opinion.  In that regard, the ALJ erred by failing to give controlling weight to the opinions of Plaintiff's treating physicians concerning the PHN diagnosis.[7]  The ALJ also erred by rejecting Plaintiff's well-documented pain, from both his shoulder injury and his PHN, on the ground that such pain was not supported by "objective evidence," when such pain was in fact supported by clinical signs and symptoms.  *See, Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) ("As a

---

[7]See Footnote 2 above.

general matter, 'objective' findings are not required in order to find that an applicant is disabled.") (citations omitted).  Consequently, the ALJ failed to consider the effect of such pain on Plaintiff's residual functional capacity, including his ability to use his right arm, as well as his ability to sit, stand and walk.  As discussed earlier, although Holder indicated that Plaintiff had limitations on his ability to sit, stand and walk, the ALJ rejected that opinion, on the grounds that it was inconsistent with the opinion of Dr. Wong.  However, that was improper, since Holder's opinion apparently dealt both with Plaintiff's shoulder and PHN problems,[8] while Wong's opinion only purported to address Plaintiff's ability to use his right arm.  Nor does Naughten's opinion provide substantial evidence to refute Wong's opinion that Plaintiff was essentially unable to use his right arm due to pain.  In that regard, although Naughten agreed that Plaintiff was experiencing pain in his right shoulder, which Plaintiff described as having "a severity of 7 out of 10" (359), he gave no explanation for concluding that such pain would result in only mild to moderate limitations. (362).

Additionally, the ALJ failed to properly consider the side-effects of Plaintiff's pain medications and the effects that such medications could have on Plaintiff's ability to work.  On this point, the reasons that the ALJ gave for rejecting Plaintiff's testimony regarding such side effects were insufficient. (38-39).  The Court also agrees that the ALJ erred, when assessing Plaintiff's credibility, by failing to properly consider Plaintiff's

---

[8]Holder was treating Plaintiff for both conditions, and the limitations on Plaintiff's ability to sit and stand presumably were related to the PHN pain.

14

work history and his consistent attempts to obtain treatment.[9]

For all of the foregoing reasons, the Court concludes that the ALJ's RFC determination was erroneous. Accordingly, the case must be remanded. Plaintiff contends that the case should be remanded solely for the calculation of benefits, since the Commissioner failed to carry her burden at step five of the five-step sequential analysis, and since the record establishes that he is disabled. In that regard, the Court finds that a correct application of the treating physician rule in this case would result in an RFC under which Plaintiff would not be able to use his right arm consistently and under which he would be limited in his ability to sit, stand and walk. Assuming such an RFC, the VE did not identify any jobs that Plaintiff could perform. Moreover, even assuming that Plaintiff could sit long enough to perform the job of telemarketer, he would need an accommodation from the employer. However, as Plaintiff's counsel argued before the Court, pursuant to *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597 (1999), the ALJ " is not entitled to consider potential accommodation by employers under the [Americans With Disabilities Act] in determining the availability of jobs in the national economy that Appellant can perform." *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 95 (3rd Cir. 2007).

Defendant maintains that the ALJ's decision is proper, and has not requested the opportunity to submit additional evidence. The Court notes, in any event, that the ALJ has already had two opportunities to render opinions, and that almost three years have

---

[9]Although, with regard to Plaintiff's credibility, the Court finds it potentially troubling that a medical note by Dr. Kasulke dated September 13, 2005, indicates that Plaintiff aggravated his back pain the previous day while "doing a roofing job" (262), inasmuch as this would have been almost a year after Plaintiff claims to have become completely disabled.

passed since Plaintiff applied for benefits. Accordingly, the case is remanded solely for the calculation of benefits.

## CONCLUSION

For the reasons discussed above, defendant's application [#4] is denied, plaintiff's application [#3] is granted, and this matter is remanded for the calculation of benefits.

So Ordered.

Dated: Rochester, New York
     September 5, 2008

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge